Scott Lines, Ph.D.
*Licensed Psychologist PSY 14167*
3529 Sacramento Street, San Francisco, CA 94118
510.644.2396 (phone & fax)

### Psychological Evaluation

Patient:            Antonio Musni
Case:               United States v. Antonio Musni, CR 07-00385 MMC
Date of Birth:      08-14-71
Date of Interview:  02-22-08
Date of Report:     02-25-08
Referred by:        Seth Chazin, Attorney at Law

**Reason for Evaluation**
Antonio Musni's attorney, Seth Chazin, requested this evaluation to determine the presence and extent of any mental disorder that might be considered in the legal proceedings against Mr. Musni.

**Procedures**
I interviewed Mr. Musni for approximately three hours in my San Francisco office on February 22, 2008. I reviewed FBI investigation summaries provided by the attorney, and received information on Mr. Musni's case in conversation with the attorney.

**Qualifications**
My professional qualifications to render this opinion are as follows. I am a clinical psychologist licensed in the state of California. I received my Ph.D. from the California School of Professional Psychology in 1992 and became licensed as a psychologist in California in 1995. I am Past-President of the Northern California Society for Psychoanalytic Psychology, a local chapter of the American Psychological Association, Division of Psychoanalysis. I have been in private practice as a licensed psychologist since 1995, where in addition to conducting individual adult and child psychotherapy and psychoanalysis, I have worked as a forensic evaluative psychologist and expert witness in innumerable civil, criminal and immigration cases, most particularly for the Psychological Trauma Center of San Francisco and for the Federal Public Defenders, Northern District of California. Prior to licensure as a psychologist, I served as a psychotherapist in several pre- and post-doctoral training sites, including Kaiser Permanente Medical Center, Oakland, CA; St. Mary's Hospital and Medical Center, San Francisco; Federal Correction Institution, Dublin, CA. I directed two community mental health agencies in the Washington, D.C. area in the mid-1980s. I am currently adjunct faculty at The Wright Institute in Berkeley, CA, and at the Access Institute, San Francisco, CA, and have taught and/or supervised the practice of psychology at the California School of Professional Psychology, the Boyer House Foundation, The California College of the Arts, St. Mary's Hospital and Medical Center, and the Westside Crisis Clinic, all in the San Francisco area.

## Appearance and Behavioral Characteristics

I interviewed Antonio Musni for approximately three hours on February 22, 2008. He was on time for the interview and casually dressed with appropriate grooming. He is a short, slightly overweight Filipino man with dark hair and wire-rim glasses who appears somewhat younger than his stated age of thirty-six. He appeared quite guarded initially, with rapid glances around the room as if he was expecting some threat, but eventually was put more at ease by the interviewer. He spoke thoughtfully, slowly and displayed a good vocabulary. Thought processes appeared slowed by some psychomotor retardation. Eye contact was variable and appropriate, that is, he often glanced away when thinking but reengaged eye contact while talking. He displayed no evidence of thought disorder or psychotic thought processes. Range of affect was quite restricted and he appeared to be tightly containing his feelings, with occasional bursts of sadness, bitterness and anger. His mood was moderately depressed, as evidenced by frequent sighs, expressions of sadness and by infrequent but apparent tearfulness. He struck this examiner as someone not used to talking about his feelings, yet badly in need of such emotional release.

Mr. Musni presented his life history in an interesting way, in that he appeared fixated on the past, on the time in his life when his parents were still living, and most particularly on the events of their deaths. By fixated, I mean that in trying to get a temporally progressive summary of events from him, he appeared stuck, unable to move beyond the events prior to and surrounding the deaths of his mother and father. In talking about more contemporary times, he kept referring back to decades earlier, only to ruminate on those past events in great detail. I had the impression that he could have talked far longer than our three hours about events that occurred decades before, that he was captivated by the past, that he somehow wished to go back there and resolve old psychic scars, and that he was unable to move into the present. This tendency for retrospective rumination will be discussed in the findings of this report.

## Family and Personal History

Mr. Musni was born in the Philippines on August 14, 1971, the last of eight children; his father is also named Antonio Musni. The other seven children (I believe four brothers and three sisters) were between twelve and twenty years older than him, with his next oldest brother, Robert, twelve years his senior. Being the youngest brother, he felt picked on and sometimes sternly disciplined by his brothers. He related that he once found some pornography of his brother's and took it to school, where he was caught with it. Sent home, one brother gave him a "serious spanking," then his father spanked him. That weekend, another brother came home, heard the story and spanked him again. He was lumped in with nieces and nephews who were closer to his age, and disciplined first and most harshly if any of them got into trouble. He says his siblings said to him, "You're the older guy, you should know better." He began feeling that he was different from his siblings, more the outcast among the sibling hierarchy.

His parents emigrated to the United States in 1984 with one of his brothers, following a sister who had moved here in 1979, leaving him at twelve years of age with an older sister. He stated that he felt abandoned by his parents. He was treated more like one of his sister's children, yet he feels her children got appropriate parenting and help with

homework that he did not receive. He rejoined his parents in the Pittsburg, California area when he and a brother emigrated to this country in March, 1991.

His father, Antonio Musni, Sr., had a history of cardiac problems dating back to the Philippines. He died of a heart attack in the U.S. in 1992 while being evaluated for angioplasty, just a year after Antonio, Jr. rejoined his parents. Mr. Musni related the trauma of his father's death, made worse by a family dispute over whether to bury the father's body in the Philippines, which was the father's wish, or to expediently bury him in the United States, which was his brother, Robert's, wish. An elder sister finally prevailed upon the disputing brothers and took the body back to the Philippines. He became estranged from his older brother, Robert, a physician in Las Vegas, at this point, stating that Robert was always concerned about securing family finances for himself and his own family. He stated, "Being divided was disheartening, we wanted to be together as a family but couldn't manage it."

Following the father's death, emotional and financial stress enveloped the family, particularly his mother, who developed health problems in response to losing her husband and the strife over his burial. She became depressed and developed lupus. Meanwhile, his brother, Robert's, wife began to, as he puts it, "disrespect my mother." This solidified Mr. Musni's feelings that brother Robert got all the good things from the family, i.e. medical school education, the deceased father's car, and most especially, the family's esteem as the "doctor in the family," which he feels was withheld from him.

Mr. Musni settled into a period of ongoing financial difficulties in the mid-1990's. He had been going to college, but the father's death left the family with little financial resources. He was forced to abandon his studies, which he regrets to this day, as he had been getting praise from instructors for his aptitude in anatomy and physiology. He began working a series of administrative assistant jobs. He worked for a time at Los Medanos College in Pittsburg, then worked as a telemarketer for the Contra Costa Times. Needing help to buy a car, his brother, Arnell, co-signed an auto loan with him. He was unable to meet both the car payment and insurance payment; he lost the car when an uninsured drunk driver hit him, totaling the car. This led to the financing and purchase of another auto. But, saddled with the debt payments on the first car, and feeling obligated to pay that note first to protect his brother's credit, he fell behind on the payments on the second car, which was repossessed. Mr. Musni's bad financial fortunes continued in this fashion, with the loss of several jobs due to office relocations or unpunctuality, and debts from student loans, unpaid taxes and car loans piling up. Meanwhile, he got mugged on Telegraph Avenue in Berkeley in 1993 or 1994. He stated that while walking toward his car after work, he stopped at a pay phone to inform his mother that he was on his way home. He was jumped by two men, who beat him in his face and demanded his money and car keys. He was able to sound the car alarm, and the men ran off. He stated he refused medical treatment because he had no health insurance.

Mr. Musni's mother developed thyroid cancer in 2000 and subsequently died in December of that year. He stated that her illness and death was a "sudden blow . . . a long, tragic, cumbersome and tiring thing, emotionally draining." When she was

diagnosed with thyroid cancer, he was working as an administrative assistant at a company, Benfield Blanch. He would travel to the hospital every night to be with her and then go to work the next day, distraught and exhausted. Her death initiated another family dispute. The mother had stated her wish to be sustained on life support as long as possible, but his brother, Robert, and a sister insisted that her suffering be alleviated by terminating the life support. He felt his mother was betrayed by this decision; he suspects she was conscious during the family discussions held at her bedside, and feels guilty that they might have distressed her. To make matters worse, the brother insisted they all go home to allow their mother to sleep, and she died alone that night. He feels guilty about this as well. She died and was buried in the Philippines, next to his father. He stated, "That was the saddest Christmas ever. The funeral was December 24, and everyone around us was immersed in holiday cheer, shopping." He returned to the States and resolved to never talk to his remaining family again, but thought better of the idea.

**Child Physical Abuse History**
Mr. Musni stated he was regularly beaten by his father and brothers for ordinary childish behavior. He stated the following regarding corporal punishment at home:

> I was hit with either a belt or a branch; not just one swat, but several. Many times my skin would get cuts and bleed. This would come with verbal putdowns--"See your nephew, see how he's doing? See your doctor brother?" There's always something they find--school performance, behavior. Instead of explaining why that's not acceptable, they greet me with a belt. They tell me they love me. But I remember feeling, "If you really love me, why do you hit me?" Everyone, from [brothers] Arnell and Robert, to my dad. It's like they think, I'm older than you are and I have the right to beat you.

**Relationship History**
Mr. Musni related a minimal relationship history. He identifies himself as gay, and stated that his longest relationship was about three months. He had an intimate relationship with his roommate during the time period encompassing his offense behavior. He stated that it was this man who disclosed Mr. Musni's homosexuality to Mr. Musni's family; he feels his family knew he was gay prior to this "outing," but it was never discussed. He feels like an outsider in this normal Catholic family because of his sexual orientation, which contributes to his longstanding feeling of being different from them.

**Mental Status Exam**
Mr. Musni displayed initial suspiciousness and an ongoing tendency to ruminate on past failures during the interview. He appeared depressed with some psychomotor retardation, i.e. slowed speech patterns, some slowness in thinking. Asked about feelings of depression and sadness, he said he suffered from such feelings from about the age of nine or ten. He referenced the child physical abuse he suffered in his family at this point. He stated he remembers often wishing for his death; he said he never felt like he fit in. He mentioned feeling very lonely when his parents moved to the U.S. He confessed to frequent thoughts of suicide by cutting himself with a sharp object or by overdosing on pills, although he said that his religion prevents him from acting on his feelings. He said

he sometimes thinks he's dying of cancer. When asked about sleep, he responded that sleep was "non-existent;" he described his sleep problems as early morning awakening.

Mr. Musni said he suffers from hypertension with high cholesterol, and thinks he is "borderline-diabetic."

### Circumstances Related to Offense Behavior

At the time of his becoming involved in the identity theft for which he is charged, Mr. Musni was living in a shared residence at 851 Church Street in San Francisco. He was working at UCSF as an administrative assistant. He stated he hadn't had a raise in some time and was struggling financially. He stated the following regarding how the identity theft began:

> Credit card applications were coming in the mail, I'm ignoring them. But my expenses are getting to me, I'm struggling financially, but I didn't want anyone in my family to know I'm losing control over it. They had started trusting me, so I didn't want to tell them what was going on financially. I thought, OK, I got this pre-approved thing in the mail--we had been getting everything from checks to applications, but we'd destroy them. But I thought, if I get this one, then pay it off.... Given the situation with my family, I didn't want to ask them for any help. I just hoped I could pay off the account and move on.

I asked Mr. Musni what he purchased with the fraudulently acquired credit cards, to which he responded, "I remember using it to buy lunches, groceries, to pay regular house expenses." He also acknowledged purchasing a golf putter that he gave to his brother, Arnell, for his 50th birthday, which he stated his brother badly wanted but couldn't afford. Another purchase was of a Dell laptop computer, which he gave to his nephew, Reinaldo Valentin. Another time he purchased several plane tickets for family and friends to fly to Las Vegas. The ticket recipients paid him back, funds he used to make a payment on a credit card.

Mr. Musni confirmed the statement he made to the FBI that his use of the credit cards ceased when he tried to use one of the cards at a Bank of America branch and was told the account had been closed.

### Clinical Findings Related to Offense Behavior

Antonio Musni's difficult life as an immigrant has been complicated by a longstanding depressive illness, dysthymia, a chronic, low-grade form of depression. The symptom profile can be found in his low self-esteem, chronic feelings of inadequacy, dependence in relationships as evidenced by his dependent tie to his mother, low motivation as evidenced by his problems with punctuality, poor judgment regarding finances, and feelings of hopelessness that things will get better for him. In my clinical experience, the etiology of dysthymia is predominantly tied to experiences of abuse and emotional neglect in childhood. The following in his history were the precursors to his dysthymia: his stated history of feeling an outsider in his sibling hierarchy; his experiences of child physical abuse and bullying by older, more highly esteemed brothers; his parents leaving

him at the age of twelve to emigrate to the United States, which felt to him like abandonment; and his burgeoning homosexuality, which further cast him as an outsider in his family and culture. This was his psychological make-up around the age of twelve; his dysthymia was unrecognized and untreated.

Dysthymia sets the sufferer up for worsening depressive symptomatology through losses in life that individuals not suffering from dysthymia are able to negotiate more successfully. This so-called "double depression" is particularly debilitating--prior depressive episodes in earlier life cause structural and functional changes in the brain, potentiating future manifestations of depressive illness when loss occurs, for instance, loss of a relationship, a job, or the death of a family member. This is the case with this man. Although undergoing the stress of acculturation with his emigration to the U.S. at nineteen, he was happily united with his parents and was hopeful of enjoying the benefits of American higher education like his older siblings. But his father's death supplanted this optimism with family strife, the loss of a loved parent, and the loss of educational opportunities by his having to quit college in order to apply his labor to augment the family's finances. These losses added to his depression; he became increasingly dependent on his mother, alienated from his more functional siblings, and increasingly trapped by impaired judgment regarding finances.

The story of his beating on Telegraph Avenue suggests he might have been suffering from some posttraumatic stress disorder post-incident. But, to my ear, it also reveals just how dependent he was on his mother--needing to call her after work to say he was coming home strikes me as unusually dependent.

Mr. Musni's mother's death in 2000 worsened his longstanding depression, tipping him over into a full-blown episode of major depressive disorder. She had been the parent he relied on most and was most strongly identified with. Her death brought a recapitulation of the family strife that had surrounded his father's internment. He distanced himself more from his family at that point, not only out of anger at them but also, I believe, by identifying with his dead mother. Evidence for this supposition comes from his unusual fixation during our interview--he simply could not move forward in his discourse of life events. He continued to refer back to his mother's provisions of care, as if *there* lay a semblance of comfort and security for him, not in the future. At one point, he stated that he had lost a few jobs because of tardiness and poor time management. I would agree that time is a problem for Mr. Musni, but not only immediate time. In my clinical experience with depressed individuals, time across the lifespan is a problem--the fact of time's movement inexorably toward the future, away from the past of insufficient love and security. One would think that someone cheated of affection and security would want to move forward; in clinical populations, the converse is usually true--the individual steps out of the stream of time, so as to reenact the past in the hopes of recovering the lost love of the past. I believe this is the case with Mr. Musni, as demonstrated by his style of speaking in the interview almost in stop-action fashion, continually falling back into events of a decade and more ago. Further identification with his dead mother is found in his ruminations on death, particularly the thought that he, like his mother, will die from

cancer. This is a fantasy of reunification with a lost family member that, for a depressed individual, often stops normal development in its tracks.

Mr. Musni's offense behavior of applying for and using credit cards assigned to another person suggests an opportunistic streak in him, a feeling that he is owed, that he feels cheated, particularly by his older brother, Robert, whose name and standing in the family came up repeatedly in the interview. But there is evidence that he was also attempting to compensate for his low self-esteem regarding his status in the family, derived from his depressive illness. His acquisition and use of the credit cards was a desperate act to elevate himself in his family's eyes, in particular his gifts for family members. The purchase of these gifts suggests that Mr. Musni was attempting to shore up feelings of low self-esteem regarding his standing in the family. Long accustomed to being treated as different, significantly younger and less mature, an outlier among the sibling hierarchy, and a homosexual among heterosexuals, it appears that Mr. Musni was attempting to compensate for the disregard he received from his siblings by appearing to be financially better off than he was. In essence, he would play the role of a brother whose generosity and financial largesse demonstrated him as a worthy member of this hard-working immigrant family. Obviously a desperate act, it also emphasizes the fact that the fraud was an act carried out by an individual compromised by a depressive illness that rendered his judgment impaired.

Diagnostic Impression:
- Axis I: Major Depressive Disorder, recurrent and moderately severe
  Dysthymia
- Axis II: None
- Axis III: Hypertension and pre-diabetic, by self report
- Axis IV: Problems with primary support group--death in family, estrangement, history of physical abuse, parental overprotection; relationship problems; economic problems.
- Axis V: GAF: 55

**Recommendations**

Antonio Musni's depressive disorders have never been medically treated. Such treatment is strongly recommended, including psychopharmacological assessment for an antidepressant medication, and ongoing individual psychotherapy. His intelligence and tendency to rely on others presents a moderately good prognosis for emotional growth through psychotherapy; individuals from a Pacific Island culture are sometimes resistant to admitting emotional problems, and any initial hesitancy in treatment should be understood within this cultural context. He should be given every opportunity to complete his college education, as such an accomplishment will serve the dual purpose of elevating his low self-esteem and providing a more secure financial outlook for the future.

Please do not hesitate to contact me if I can clarify any aspect of this report.

Sincerely yours,

Scott Lines, Ph.D.
Clinical Psychologist
PSY 14167

# SHARPER FUTURE

SOCIAL HABILITATION AND RELAPSE PREVENTION - EXPERT RESOURSES
A Division of Pacific Forensic Psychology Associates, Inc.

Kerstin Anderson, MFT (MFC 44395)
870 Market St. Suite 1277
SF, CA 94102

February 25, 2008

Mr. Seth P. Chazin
360 Ritch St. Suite 201
SF, CA 94107

Dear Mr. Chazin,

I am writing to you on behalf of our shared client Antonio Musni who is a client of Sharper Future. I have been meeting with Mr. Musni for weekly mental health counseling sessions since 12/26/07 for a total of seven sessions. He attends his appointments on time with an earnest willingness to explore issues related to self improvement and personal development. The client has consistently presented as moderately depressed about current and past life circumstances as well as anxious regarding social situations and his future. His mood is generally low and he exhibits some mild paranoid ideas about other's perceptions of him. Despite Mr. Musni's difficult circumstances, he has consistently responded to this writer with respect and a genuine concern for both my time and my boundaries. During our seven sessions I have not noticed any anti-social traits or psychopathic behaviors present in the client's personality make up. I believe that Mr. Musni has the capacity to learn from his mistakes and move forward in a constructive direction.

Sincerely,

Kerstin Anderson

SHARPER FUTURE
870 Market Street, Suite 1277 • San Francisco, CA 94102   ♦   1440 Broadway Street, Suite 205 • Oakland, CA 94612
Phone (415) 397-6622, Fax: (415) 397-6666   ♦   Phone: (510)836-0220, Fax: (510)835-0219